**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAURIE TSAO, AKA Laurie Chang,
          *Plaintiff-Appellant,*

          v.

DESERT PALACE, INC.; T. CRUMRINE,
          *Defendants-Appellees.*

No. 09-16233

D.C. No.
2:08-cv-00713-RCJ-
GWF

LAURIE TSAO, AKA Laurie Chang,
          *Plaintiff-Appellant,*

          v.

DESERT PALACE, INC.; T. CRUMRINE,
          *Defendants-Appellees.*

No. 09-17535

D.C. No.
2:08-cv-00713-RCJ-
GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted October 7, 2010
San Francisco, California
Submission Vacated May 24, 2012

Argued and Submitted
June 21, 2012—Pasadena, California

Filed October 23, 2012

12841

Before: Alex Kozinski, Chief Judge,* Stephen Reinhardt and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

---

*Following the death of Judge Louis Pollak of the Eastern District of
Pennsylvania, who was initially a member of the panel, Chief Judge
Kozinski was drawn to replace him and the case was reheard before the
newly constituted panel.

## COUNSEL

Robert A. Nersesian of Nersesian and Sankiewicz, Las Vegas, Nevada, for plaintiff-appellant Laurie Tsao.

Thomas D. Dillard, Philip S. Gerson, and David M. Jones of Olson, Cannon, Gormley & Desruisseaux, Las Vegas, Nevada, for defendant-appellee Desert Palace, Inc.

Micah S. Echols and Craig R. Anderson of Marquis & Aurbach, Las Vegas, Nevada, for defendant-appellee Travis Crumrine.

---

## OPINION

BERZON, Circuit Judge:

Plaintiff-Appellant Laurie Tsao is a so-called "advantage" gambler—a professional gambler who uses legal techniques, such as card counting, to win at casino table games, especially blackjack.[1] She was arrested at Caesars Palace (a casino owned by the Defendant-Appellee Desert Palace) for trespassing and obstructing the duties of a police officer, and now challenges that arrest as unconstitutional and as constituting various common law torts. The District Court held that the casino's security guard (non-party Clint Makeley) had probable cause to make a citizen's arrest of Tsao for criminal trespassing; that Las Vegas Metro Police Officer Travis Crumrine, a Defendant-Appellee, had probable cause to arrest Tsao for obstructing the duties of a police officer; and that the probable cause determinations barred Tsao's various claims for relief against Crumrine and Desert Palace. Tsao appeals those holdings and also the District Court's grant of attorneys' fees to Crumrine, as well as the award of certain costs to both defendants.

---

[1]As the District Court noted in its opinion, Tsao and her husband, John Chang, were members of the so-called MIT Blackjack Team, depicted in the book "Bringing Down the House" and the movie based on it, "21." *See also MIT Blackjack Team*, Wikipedia, http://en.wikipedia.org/wiki/MIT_Blackjack_Team (last visited August 2, 2012).

"Card counting is a mathematical process which enables the player to achieve better odds when playing blackjack." *Chen v. Nev. State Gaming Control Bd.*, 994 P.2d 1151, 1152 n.1 (Nev. 2000) (en banc). "[A]n 'advantage gambler' . . . is a regular net winner in Las Vegas casinos." *Fayer v. Vaughn*, 649 F.3d 1061, 1063 (9th Cir. 2011) (per curiam).

## I. BACKGROUND[2]

### A. *Casinos & "advantage" players*

This case grows out of the high-stakes cat-and-mouse game played between advantage gamblers and Desert Palace (sometimes referred to as "the casino"), which operates a number of gambling venues, including Caesars Palace in Las Vegas. Desert Palace attempts to identify advantage players and "trespass" them—that is, tell them to leave and not return—from the casino's property. Under Nevada's trespass statute, Nevada Revised Statute ("NRS") § 207.200, returning to a location from which one has been told not to return by a property owner or its agent, or remaining after having been asked to leave, is a misdemeanor. To avoid being trespassed, or, once trespassed, to avoid being charged with misdemeanor trespassing, advantage players apparently take a number of steps to evade detection, including wearing disguises, obtaining player's cards in false names, and gambling with the player's cards of friends and family.[3]

### B. *Desert Palace Security and the Summons in Lieu of Arrest Program*

Once a Desert Palace casino has identified a patron as an

---

[2]Because we are reviewing the District Court's decision to grant the defendants' motions for summary judgment, we present the facts here in the light most favorable to the non-moving party, Tsao. *See Luchtel v. Hagemann*, 623 F.3d 975, 978 (9th Cir. 2010).

[3]We do not address the legality of these actions, as that issue is not before us. *Cf. Chen*, 994 P.2d at 1152 (holding that a patron playing under an alias and with a player's card obtained with a false passport did not commit fraud); *id.* at 1153 (Maupin, J., dissenting) ("[N]either card counting nor the use of a legal subterfuge such as a disguise to gain access to this table game [blackjack] is illegal under Nevada law."); *see also Fayer*, 649 F.3d at 1064 n.3 (discussing Nevada law prohibiting "the possession of identification documents or information for the purpose of establishing a false identity" (emphasis and citation omitted)).

advantage player, it typically instructs its security guards to escort that individual from the premises and warn her against returning. Desert Palace also directs its security to identify individuals who have returned despite having received a trespass warning. Pursuant to the policies in effect at Caesars Palace at all times relevant to this suit, if a previously trespassed individual returned to the casino, the security supervisor had the discretion to escort the individual from the casino with a second warning; to effect a citizen's arrest for trespassing;[4] or to issue a citation to appear in court to answer for the crime of misdemeanor trespassing.

Private security guards, of course, typically do not have the ability to issue citations for criminal offenses. Some of the security guards at Caesars Palace, however, have the authority to issue a summons[5] in lieu of arrest ("SILA"). To obtain this authority, private casino security guards must take a training course given by the Las Vegas Metro Police Department ("LVMPD"). During his deposition, Officer Crumrine explained that the LVMPD invites the security personnel of the city's casinos and department stores to take part in the SILA program "[t]o alleviate some of the manpower concerns

---

[4]Section 171.126(1) of Nevada's Revised Statutes authorizes a citizen's arrest "[f]or a public offense committed or attempted in the person's presence." Misdemeanor trespassing, as defined in NRS § 207.200, is considered a public offense. *See* NRS § 206.140(2).

[5]Technically, the guards are authorized to issue a "citation," rather than a "summons." *Compare* Black's Law Dictionary (9th ed. 2009) (defining a "citation" as "1. A court-issued writ that commands a person to appear at a certain time and place to do something demanded in the writ, or to show cause for not doing so. 2. A police-issued order to appear before a judge on a given date to defend against a stated charge, such as a traffic violation.") *with id.* (defining "summons" as, *inter alia*, "1. A writ or process commencing the plaintiff's action and requiring the defendant to appear and answer. 2. A notice requiring a person to appear in court as a juror or witness."); *see also* NRS § 171.1773 (specifying the form and contents of a citation). The parties, however, refer to it as a "summons." We use the two terms interchangeably.

of the police" by relieving local law enforcement of the obligation to respond to calls regarding relatively minor crimes.

After being trained, the security guards can issue summonses for criminal trespassing,[6] so long as the suspect is positively identified; not under the influence of intoxicating substances; cooperative; and free of outstanding arrest warrants. The guards verify that a particular individual does not have outstanding warrants by calling the records department of the LVMPD. A citation issued by a Caesars Palace security guard looks no different from one given by an LVMPD officer: it commands the suspect's appearance in court on a specified date and time, and states, accurately, that the failure to appear constitutes a separate offense. *See* NRS § 171.17785(1) ("It is unlawful for a person to violate a written promise to appear given to a peace officer upon the issuance of a misdemeanor citation . . . ."); Las Vegas Municipal Code ("LVMC") § 1.20.060 (2009) ("When an accused signs a citation promising to appear at the time and place specified in the citation and fails to appear as promised, the Court shall issue and have delivered for execution a warrant for his arrest.").

After the SILA officer has issued the citation, Nevada law requires that it be filed "with a court having jurisdiction over the alleged offense." NRS § 171.1776(1). The Justice Courts have jurisdiction over all misdemeanors, including the offenses for which the SILA officers may issue citations. *See* NRS § 4.370(3); *Parsons v. Fifth Jud. Dist. Ct. of Nev., In & For Cnty. of Nye* ["*Parsons I*"], 885 P.2d 1316, 1319 (Nev. 1994), *overruled on other grounds by Parsons v. State* ["*Parsons II*"], 10 P.3d 836 (Nev. 2000) (en banc). Once properly filed, the citation is "deemed to be a lawful complaint for the purpose of prosecution." NRS § 171.1778.

---

[6]According to Officer Crumrine, SILA officers can also issue summonses for petty larceny and defrauding an innkeeper. The record is silent as to whether they can issue a summons for other crimes.

While Nevada law requires many public offenses to be prosecuted by indictment or information, there is an exception for offenses tried in Justice Courts, which are prosecuted by complaint. NRS § 172.015. Taken together, these features of Nevada law mean that a misdemeanor citation issued by a SILA officer not only initiates the formal criminal justice process by informing the court of the alleged criminal violation and commanding the defendant's presence, but also serves as the state's own charging document. *See* NRS §§ 4.370(3), 171.1776(1), 171.1778, 172.015; *Parsons I*, 885 P.2d at 1319-20.

In sum, SILA officers have the authority to issue citations that compel individuals to appear in a particular Nevada Justice Court at a specified date and time, thereby performing a law enforcement function. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163-64, 163 n.14 (1978). When they do appear in the Justice Courts, the accused must defend against the criminal charges levied by the officer who issued the citation; in this respect, the SILA officers also perform a prosecutorial or quasi-prosecutorial function. *See Robertson v. United States ex rel. Watson*, 130 S. Ct. 2184, 2185-87 (2010) (per curiam) (Roberts, C.J., dissenting from the dismissal of the writ of certiorari as improvidently granted) (suggesting that criminal prosecutions may only be brought "in the name and pursuant to the power of the [state]").

## C. *Tsao's arrest by Desert Palace*

Laurie Tsao is a professional gambler, apparently quite a good one. Tsao has received several trespass warnings. Prior to her arrest at Caesars Palace, she had been "trespassed" from Desert Palace properties on at least five occasions under four different names: Cao Hong, Laurie Cao, Laurie Tsao, and Shuyu Deng. On each occasion, she was told that she was not welcome on any of the casino's properties, including Caesars Palace, and was warned that she could be arrested for trespassing if she returned. The last of these warnings was given

by Clint Makeley, the night shift supervisor of Caesars Palace security, on September 23, 2007.

Following that warning, but before Tsao was arrested on March 19, 2008, Desert Palace mailed her at least three promotional offers. The offers were sent to Tsao's home address and were directed to "Laurie Tsao." The first offer, valid from December 1, 2007 through February 29, 2008, offered a free four-night stay at one of seven Las Vegas casino hotels (including Caesars Palace) owned by Desert Palace. The second (labeled an "invitation") was valid from March 19 through March 24, 2008, and offered a three-night stay at one of the same seven hotels, as well as entry to a "VIP Viewing Area" to watch college basketball and "VIP access to Race and Sports Book wagering area." The third, valid from March 1 through May 31, 2008, included six different offers, including one for a free four-night stay at one of Desert Palace's casino hotels. Tsao's claims against Desert Palace turn in large part on whether these offers can reasonably be viewed as "invitations" for Tsao to play blackjack at Caesars Palace.

Tsao returned to Caesars Palace around 2:00 a.m. on March 19, 2008, along with her friend and fellow advantage player Nelson Fu. Tsao was using a player's card for someone named "Monica Lieu," which she had found abandoned during a prior visit. Around 5:00 a.m., someone from the Caesars Palace surveillance team advised Makeley that a patron on the property had been trespassed on September 23, 2007, under the name of "Shuyu Deng." After reviewing casino records, Makeley told John Banner, the casino manager, that the casino could (a) re-trespass and escort Tsao out of the casino; (b) issue her a SILA if she had identification; or (c) make a citizen's arrest for trespassing. Banner and/or Makeley apparently decided to do (b) or (c), depending on whether Tsao had identification.[7]

_____

[7]The record is unclear as to whether Makeley made this decision alone or if he made it together with Banner. Although Makeley testified at his deposition that it was his "call," he also said that he checked with Banner to see "if he agreed with me or how he wished to pursue with this matter we have in hand."

As depicted by the casino's surveillance video (which is part of the record), Makeley and two other security guards approached Tsao on the casino floor at approximately 5:18 a.m. Makeley asked her for identification; when Tsao stated that she had none, Makeley allegedly replied that she would "rot in jail." Tsao then asked repeatedly to be permitted to leave, a request Makeley refused. After arguing with Tsao on the casino floor, Makeley and the two other security guards grabbed Tsao by the arm, handcuffed her (even though she was not behaving aggressively), and led her off the floor, through the casino, and into an interview room.

After arresting Tsao, Makeley approached Fu and asked him for identification. Fu, who apparently had not been previously trespassed from Caesars Palace, was allowed to leave with a trespass warning. After leaving the casino, Fu immediately called Tsao's husband, John Chang, to inform him of Tsao's arrest. Chang then called Robert Nersesian, the couple's long-time attorney. Chang advised Nersesian of Tsao's arrest and of the previous trespass warning, and said that he (Chang) had the promotional offers that Caesars Palace had sent to Tsao. Nersesian immediately met with Chang, obtained the mailed offers, and proceeded to Caesars Palace.

Meanwhile, Makeley had called LVMPD to ask for an officer's assistance. As he waited for the officer to arrive, Makeley began questioning Tsao, who was still in handcuffs. When Tsao stated that she did not have identification with her, Makeley asked rhetorically, "Wouldn't you rather get a ticket from me and be on your way, rather than go to jail? That's your choices. [sic] Carry ID and get the ticket." When Tsao asked which ticket Makeley was referencing, Makeley told her, "I go to all the classes just like the police department. I get to write you a ticket and get you on your way in no time." Tsao stated that she had identification in her car that she could retrieve, to which Makeley responded, "[i]t doesn't work that way." In response to Tsao's question, "How am I supposed to

know that?", Makeley responded that she should "ask the judge."

Makeley then began questioning Tsao about her identity, apparently the first time that Tsao was asked for her name. While that question is a simple one, the answer is complicated in Tsao's case. In addition to playing (and having been trespassed) under various aliases, Tsao has other reasons for using different names. Like many other Chinese immigrants, Tsao took an English first name (Laurie) when she immigrated, though she sometimes appends her Chinese first name, Hong, as either a middle or a second last name. With regard to her last name, it is translated from a Chinese character; in her case, the closest English spelling approximation is "Cao," which Tsao sometimes uses. However, upon discovering that many native English speakers pronounce "Cao" as "cow," Tsao began also using "Tsao," which is closer to how her Chinese name ought to be pronounced. Tsao also went for a time by the last name of "Chen," the surname of her first husband, whom she divorced in 1997. After her divorce, she reverted to using her birth name, Tsao.

In 2001, Tsao married her current husband, John Chang. She now sometimes goes by Laurie Chang. Her U.S. passport was issued to "Laurie Chang." But she also still uses "Tsao" as her surname, and her Nevada driver's license and credit cards are issued in that name. When questioned by Makeley, Tsao told him that her name was "Laurie Chang," although Makeley seems to have heard the last name as "Chen."[8]

---

[8]There is evidence in the record suggesting that Laurie gave her surname as "Chang" because she was concerned that the name "Tsao" would cause her more problems than "Chang." Tsao also maintains that because "Chang" is the name on her U.S. passport, she considered it her "highest and best name."

D.   *Officer Crumrine's arrival*

LVMPD officer (and defendant) Travis Crumrine arrived at Caesars Palace at approximately 5:45 a.m. As soon as Crumrine entered the interview room, Makeley—who knew Crumrine from previous calls to which Crumrine had responded— informed Crumrine that Tsao had given the name "Laurie Chen," had been trespassed on September 28, 2007, and had been playing on that night under an alias. Tsao was, at this point, still in handcuffs, and remained in handcuffs throughout the remainder of her time at the casino.

Crumrine, without ever identifying himself by name or position or giving any *Miranda* warnings, began questioning Tsao while simultaneously rummaging through her purse. Over the next several minutes, Crumrine questioned Tsao about how much money she had with her; her occupation; whether she had been arrested before; her age; why she did not have identification with her; and how she had arrived at the casino that night. When Tsao stated that she had driven, Crumrine asked where her car was parked. Tsao answered that her car was being driven by a friend. Crumrine then asked whether Tsao was lying; she answered "maybe."[9] Understandably annoyed, Crumrine told Tsao that "the next question I ask you is very serious for you not to lie to me, because if you lie to me, I have to take you to jail. Do you understand?" After Tsao indicated that she understood, Crumrine asked, "What's your last name?" Tsao said that her last name was "Chang." After asking Tsao a few more questions about her identity, including her date of birth, Social Security number, and the state in which she is licensed to drive—to all of which Tsao answered truthfully—Crumrine left the room. After Crumrine left the interview room, he attempted to search for

---

[9]Tsao said later that she said "maybe" because she thought it likely that, by that time, Fu or her husband had moved the vehicle from the Caesars Palace parking lot, in which case her answer would have been true.

"Laurie Chang" in the Nevada databases to which he had access, but the search yielded no results.

The remainder of Tsao's time in the interview room, as portrayed by the video recording, is mostly unremarkable, except in a few respects. Approximately ten minutes after Crumrine left the interview room, Tsao asked a casino security guard whether Crumrine was a police officer; the guard said he was. About twelve minutes later, Crumrine returned to the interview room and began going through Tsao's purse once more, at which point he found her car keys. Crumrine gave the keys to Caesars Palace security guards, instructing them to try to identify Tsao's vehicle in the Caesars Palace parking lot by pushing the "panic" button on the key fob. According to Crumrine, the ploy worked, and he was ultimately able positively to identify Tsao from the DMV records associated with her Social Security and license plate numbers.

At approximately 6:45 a.m., Nersesian arrived at the casino and spoke to Crumrine. Nersesian first identified himself as the attorney for "Laurie Tsao," to which Crumrine responded that the only person he had in custody was "Laurie Chang."[10] Nersesian explained that Laurie was "transitioning between" her birth and married names; that she uses both Chang and Tsao; and that Nersesian could have Mr. Chang on the premises within five minutes to confirm that Tsao uses both names. Nersesian showed Crumrine the promotional offers that Desert Palace had sent Tsao since she was last trespassed, explaining that the offers rescinded any prior trespass warning. Crumrine responded only that Nersesian's argument was "pretty weak." Before the conversation ended, Nersesian asked if Tsao could simply be given a summons, rather than be arrested, an option Crumrine refused.[11] Immediately after

---

[10]The record indicates that by the time he spoke to Nersesian, Crumrine likely knew that the woman being held in the interview room was, in fact, Laurie Tsao.

[11]At oral argument on appeal, Crumrine's attorney suggested that Crumrine could not simply release Tsao with a citation after detaining her for

his encounter with Nersesian, Crumrine told Makeley, who had not been privy to the conversation, that it "might have been a mistake" to talk to Nersesian at all.

Tsao was finally escorted out of the interview room around 7:30 a.m., about an hour and forty minutes after Crumrine arrived. At some point, she was given a summons for misdemeanor trespassing. Although the record is unclear as to when the summons was written or when she received it, both Makeley and Crumrine signed their names in the box marked "Officer/Complainant's Signature."[12]

Crumrine took Tsao to the Clark County Detention Center. While booking her, he explained that she was under arrest for providing false information to a police officer, NRS § 197.190. Tsao spent approximately ten hours in the Clark County Detention Center. The prosecutor later dismissed both the trespassing charge and the charge for providing false information to a police officer.

E. *The litigation*

Tsao filed suit on May 9, 2008 in Nevada state court against Desert Palace and Crumrine, requesting compensatory

---

as long as he had because, under Nevada law, temporary detentions of more than sixty minutes are per se unreasonable. *See* NRS § 171.123(4); *State v. McKellips*, 49 P.3d 655, 660 (Nev. 2002) ("[U]nder NRS 171.123, once an individual has been detained, the officer has sixty minutes to either release or arrest the individual."); *Barrios-Lomeli v. State*, 961 P.2d 750, 750 (Nev. 1998) ("According to NRS 171.123(4), a detention longer than sixty minutes is unreasonable *per se*.").

[12]Desert Palace argues that Crumrine signed the summons as a witness only. Because both names appear in the same box, with no designation of one or the other as the complainant and the other as witness, a jury would certainly be entitled to conclude that both signed in the same capacity. On summary judgment, we must take the facts in the light most favorable to Tsao.

and punitive damages. She alleged several claims for relief applicable to both defendants, including a constitutional claim under 42 U.S.C. § 1983 for unreasonable search and seizure and claims for the common-law torts of battery, false imprisonment, and defamation. Three other claims—for common-law assault, premises liability, and abuse of process—were directed solely at Desert Palace.[13]

The case was timely removed to the District Court for the District of Nevada. The District Court denied Tsao's motion for partial summary judgment as to Desert Palace's liability for false imprisonment, which was premised on the argument that the casino could not lawfully give Tsao a trespass warning. Later, the District Court entered an order denying Tsao's second motion for partial summary judgment (directed at both defendants) and granting summary judgment to the defendants on all counts. Finally, in a third order, the District Court granted Crumrine's motion for $1,474.80 in costs and $15,000 in attorneys' fees, finding that Tsao's claims were "frivolous, unreasonable, and without foundation." On the same day, the District Court granted Desert Palace $4,049.48 in costs.

Tsao timely appealed all three orders.

## DISCUSSION

Tsao's claims arise from two discrete arrests, although their timing and the events leading up to them were closely related. The claims against Desert Palace concern the arrest effected

---

[13]Tsao also alleged a claim against both defendants for the intentional infliction of emotional distress, but she abandoned it on appeal. Additionally, while the District Court construed Tsao's complaint as stating a Fifth Amendment claim against Crumrine for the alleged violation of Tsao's *Miranda* rights, Tsao did not argue in her opening brief that the District Court's dismissal of that claim was erroneous, thereby waiving appeal of that issue. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1114 n.8 (9th Cir. 2005); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

by its security supervisor, Clint Makeley, for trespassing under NRS § 207.200; those against Crumrine are premised on his arrest of Tsao for obstructing his investigation by providing false information, in violation of NRS § 197.90.

The District Court held that the undisputed facts established that probable cause supported each of the arrests, thereby entitling the defendants to summary judgment on all claims as a matter of law. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). We affirm the District Court's grant of summary judgment to Crumrine on Tsao's § 1983 claim. We also conclude, albeit on somewhat different grounds than those relied upon by the District Court, that Desert Palace is entitled to summary judgment on Tsao's § 1983 claims. Because our holding on the § 1983 claims resolves all the federal claims but alters the circumstances in which the District Court decided to exercise supplemental jurisdiction over the state law claims, *see* 28 U.S.C. § 1367, we remand the state law claims to the District Court to consider whether it wishes to continue exercising jurisdiction over them, in which case it would have to reconsider its conclusions regarding the viability of the state law causes of action in light of legal principles it did not take into account.

We consider the federal claims first.

## I.   Claims under 42 U.S.C. § 1983

"To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011). The crux of Tsao's § 1983 claims against both Desert Palace and Crumrine is that each violated her Fourth Amendment right to be free of unreasonable searches and seizures while acting under color of state law.

A.  *Desert Palace*

Tsao alleges that her arrest and detention for trespassing by Desert Palace, acting through Makeley, were without probable cause because the casino had invited her to return to the premises through the promotional offers. Because Tsao has sued Desert Palace and not Makeley, we must initially address whether the suit against Desert Palace could be proper.

**[1]** To decide that question, we begin by considering, for the first time in this circuit, whether *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), applies to suits against private entities under § 1983. In *Monell*, the Supreme Court held that municipalities and other local government units could be sued for constitutional violations under § 1983. *Id.* at 690. The court also held, however, that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words . . . on a *respondeat superior* theory." *Id.* at 691 (emphasis in original). To create liability under § 1983, the constitutional violation must be caused by "a policy, practice, or custom of the entity," *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011), or be the result of an order by a policy-making officer, *see Gibson v. County of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002). Whether *Monell* applies to suits against private entities under § 1983 is a threshold question with regard to Desert Palace's liability because, if it does, *Monell* establishes the parameters of such liability.

**[2]** Every one of our sister circuits to have considered the issue has concluded that the requirements of *Monell* do apply to suits against private entities under § 1983. *See Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990); *Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128-29 (7th Cir. 1982); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds sub nom.*

*City of Lawton v. Lusby*, 474 U.S. 805 (1985); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *see also Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 174 (3d Cir. 2004); *Lyons v. Nat'l Car Rental Sys., Inc.*, 30 F.3d 240, 246 (1st Cir. 1994). Like those circuits, we see no basis in the reasoning underlying *Monell* to distinguish between municipalities and private entities acting under color of state law.

As *Monell* observed, the text of § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." 436 U.S. at 692. On the contrary, the Court observed, Congress explicitly provided "that A's tort became B's liability if B 'caused' A to subject another to a tort." *Id.* Thus, the Court held, "constitutional deprivations" could subject a municipality to liability under § 1983 if they were the result of a "governmental 'custom' " sufficient to establish causation. *Id.* at 690-91. It would be odd indeed to suggest that this interpretation has less force in the context of a suit against a private entity. *See Powell*, 678 F.2d at 506 ("No element of the Court's ratio decidendi lends support for distinguishing the case of a private corporation.").

**[3]** To make out a claim against Desert Palace under *Monell*, Tsao must show that (1) Desert Palace acted under color of state law, and (2) if a constitutional violation occurred, the violation was caused by an official policy or custom of Desert Palace. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008). We address each requirement in turn.

### i.   Color of state law

Desert Palace is a private corporation. Although § 1983 makes liable only those who act "under color of" state law, "even a private entity can, in certain circumstances, be subject to liability under section 1983." *Villegas v. Gilroy Garlic Fes-*

*tival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc). Specifically, a plaintiff must show that "the conduct allegedly causing the deprivation of a federal right [was] fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). "The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002). We hold that Desert Palace's actions are "fairly attributable to the state" under the joint action test.[14]

[4] The joint action test asks " 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.' " *Id.* at 445 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995)). This requirement can be satisfied either "by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.' " *Id.* (quoting *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989)). Ultimately, joint action exists when the state has " 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity.' " *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (alteration in original) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Particularly relevant here is the maxim that "if the state 'knowingly accepts the benefits derived from unconstitutional behavior,' . . . then the conduct can be treated as state action." *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988)).

[5] Desert Palace's behavior qualifies as state action under

---

[14]In view of our conclusion, we need not consider whether Tsao's allegations are sufficient to meet the public function test or either of the other two tests for state action.

the joint action test thanks to its system of cooperation and interdependence with the LVMPD. First, under the SILA program, some Desert Palace security personnel have the authority, normally reserved to the state, to issue a citation to appear in court for the crime of misdemeanor trespassing. To gain this authority, security guards must take a training course given by the LVMPD. This delegation of authority by the police department, Crumrine explained, helps "alleviate some of the manpower concerns of the police" by relieving them from responding to every claim of trespassing that arises at a casino. Security guards with SILA authority may not arrest a suspect who has an outstanding arrest warrant, so they routinely call the LVMPD's records department to get information concerning warrants. The citations that security guards issue are no different from those issued by police officers, and failure to respond to them by appearing in court constitutes a separate offense. *See* NRS § 171.17785(1).

**[6]** Desert Palace and the state are therefore joint participants in the SILA program, which produces benefits that accrue to both Desert Palace and the LVMPD. *See Tarkanian*, 488 U.S. at 192. By training Desert Palace security guards, providing information from the records department, and delegating the authority to issue citations, the State has "so far insinuated itself into a position of interdependence with [Desert Palace] that it must be recognized as a joint participant in the challenged activity." *Gorenc*, 869 F.2d at 507.

The existence of SILA authority pervasively affected Makeley's interactions with Tsao. When Makeley dealt with Tsao, he was in a position to invoke his SILA authority to justify his actions, giving Tsao the (accurate) impression that he was "clothed with the authority of state law," *Williams v. United States*, 341 U.S. 97, 99 (1951). For example, when Tsao told Makeley on the casino floor that she did not have identification, he told her that she would "rot in jail." Back in the interview room, Makeley informed Tsao that because he "go[es] to all the classes just like the police department," he

"get[s] to write . . . tickets" just like they do, and that her options were to "carry ID and get the ticket" or "go to jail." When Tsao complained that she did not know that she had to carry identification, Makeley told her that she would have to tell it to "the judge."

**[7]** Furthermore, as the facts of this case illustrate, Makeley's ultimate decision to make what was in form a citizens' arrest is part and parcel of the overall trespass enforcement program established by Desert Palace and LVMPD jointly. Under that program, Desert Palace security guards may not issue a citation unless they are able to identify their suspect. Makeley testified that he decided before he approached Tsao that he would either issue her a SILA or make a citizen's arrest for trespassing, depending on whether he could identify her. Desert Palace's trespass enforcement program therefore depended in its basic format on the cloak of state authority under which it operated.

*Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), is instructive in this regard. In that case, the Tenth Circuit held that an off-duty police officer employed as a security guard was a state actor when he made a citizen's arrest for shoplifting. *Id.* at 1429. Notably, the security guard told the plaintiff that "he was going to jail," and the police department provided the store that employed him "with special forms prepared for merchants who detained suspected shoplifters which apparently allowed officers the discretion to issue a summons to a suspect . . . without taking the person to jail." *Id.* at 1429-30. Thus, "the local police followed a policy that allowed [the security guard] to substitute his judgment for that of the police." *Id.* at 1430. "Such cooperative activity between the police department and a private party," the court concluded, "is sufficient to make [the guard] a party acting under color of state law." *Id.*

Just as in *Lusby*, Makeley did more than effectuate a citizen's arrest—he purported to act on behalf of the state from

the outset of the encounter. That pretense, although not con-
clusive, supports Tsao's contention that Makeley was a state
actor for purposes of § 1983. *See Griffin v. Maryland*, 378
U.S. 130, 135 (1964) ("If an individual is possessed of state
authority and purports to act under that authority, his action
is state action. It is irrelevant that he might have taken the
same action had he acted in a purely private capacity . . . .");
*see also Flagg Bros.*, 436 U.S. at 163 n.14; *Traver v. Meshriy*,
627 F.2d 934, 938 (9th Cir. 1980) (holding that an off-duty
police officer employed as a bank security guard acted under
color of law when he identified himself as a police officer to
a bank robbery suspect); *United States v. Temple*, 447 F.3d
130, 139 (2d Cir. 2006).

Given the particular characteristics of Desert Palace's pro-
gram for ousting unwanted gamblers, the District Court's reli-
ance on *Collins v. Womancare*, 878 F.2d at 1154, to reject the
existence of state action was misplaced. In *Collins*, an abor-
tion provider obtained an injunction prohibiting certain indi-
viduals from protesting immediately in front of its offices.
878 F.2d at 1146. When protestors not subject to the injunc-
tion demonstrated in front of the abortion provider, two of its
employees effected a citizen's arrest and turned the protestors
over to a waiting policeman. *Id.* We held that the employees
who made the arrest were not state actors, as the police played
no role in initiating the arrests, conducted independent inves-
tigations, and maintained a policy of neutrality throughout.
Consequently, the state had not "so far insinuated itself into
a position of interdependence with [the defendant's employ-
ees] that it must be recognized as a joint participant in the
challenged activity." *Id.* at 1155 (internal quotation marks
omitted).

**[8]** Unlike in *Collins*, Makeley invoked the authority of the
state throughout the encounter with Tsao, stressing his author-
ity under the SILA program. Then, Makeley and Crumrine
acted in concert from the time Crumrine arrived at the casino.
Crumrine did not simply effectuate a citizen's arrest that had

already been made, maintaining his neutrality throughout, nor did he "refuse[ ] . . . to arrest [Tsao] on his own authority." 878 F.2d at 1155. Rather, he entered the room where Makeley was questioning Tsao and took over the investigation into Tsao's identity. Crumrine asked numerous questions, searched Tsao's purse and pockets, and talked to her lawyer when he arrived. Crumrine also directed Desert Palace security guards to locate Tsao's car, which helped him determine her identity. Eventually, Crumrine and Makeley *both* signed the summons Tsao received for misdemeanor trespassing. Makeley, and therefore Desert Palace (if it was otherwise liable), was without a doubt engaged in joint action with the LVMPD when Makeley detained, investigated, arrested, and cited Tsao.

Because we conclude that Desert Palace was a state actor, we must next consider whether the casino violated Tsao's constitutional rights.

### ii. *Constitutional deprivation*

Desert Palace arrested Tsao for trespassing in violation of NRS § 207.200. Tsao argues that this arrest violated her Fourth Amendment rights because it was not supported by probable cause. *See United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983).

Tsao had been ejected from Caesars Palace at least five times, most recently on September 23, 2007. If that were the end of the matter, it would be clear that she trespassed when she returned on March 19, 2008. *See* NRS § 207.200(1)(b); *see also Jordan v. State ex rel. DMV & Pub. Safety*, 110 P.3d 30, 47 (Nev. 2005), *overruled on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670 (Nev. 2008). Tsao argues, however, that the promotional offers from Desert Palace effectively rescinded the earlier trespass warnings and invited her back onto the property, and that she therefore was not trespassing when she returned. The District Court rejected

this argument, holding that (1) the promotional offers were not sufficient to rescind the earlier trespass warning as a matter of law; and (2) even if the promotional offers did represent consent to Tsao's visit, Makeley still had probable cause to believe Tsao was trespassing because he was not aware of them.

As an initial matter, Makeley's ignorance of the invitations was not sufficient to defeat Tsao's constitutional claim. Her suit is against Desert Palace, not Makeley. We have repeatedly held that "[i]f a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Fairley*, 281 F.3d at 917. *Fairley* applied this rule to Fourth Amendment claims for arrest without probable cause, also at issue here, and made clear that the rule applies "whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Id.* at 916-17, 917 n.4 (citing *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994)).

Simply put, the fact that Makeley himself may have had probable cause to arrest Tsao is irrelevant in a suit against Desert Palace. *See* Restatement (Third) of Agency § 7.04 cmt. b ("If the agent's conduct is not tortious, the principal is subject to liability if the same conduct on the part of the principal would have subjected the principal to tort liability. For example, an agent's action may not be tortious because the agent lacks information known to the principal."). Assuming the promotional offers were legally sufficient to constitute an invitation, Makeley's ignorance of them has no bearing on whether Desert Palace, if otherwise liable, violated Tsao's Fourth Amendment rights.

Whether the invitations Tsao received from Desert Palace were sufficient to consent to her presence at the blackjack table is, as we explain later, a much more complicated issue, one that involves novel questions of state law. *See* pg. 12878

*infra*. Because we conclude that Tsao has not sufficiently alleged an "official policy, custom, or pattern" on the part of Desert Palace involving such invitations, we need not reach that state law issue, and do not do so.

### iii.    Official policy, custom, or pattern

**[9]** Tsao must demonstrate that an "official policy, custom, or pattern" on the part of Desert Palace was "the actionable cause of the claimed injury." *Harper*, 533 F.3d at 1022, 1026. A "policy" is " 'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (alteration in original) (quoting *Fairley*, 281 F.2d at 918). *Gibson v. County of Washoe* discussed two types of policies: those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so, and those that result, through omission, in municipal responsibility "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." 290 F.3d at 1185-86 (citing *City of Canton v. Harris*, 489 U.S. 378, 387-89 (1989)). We have referred to these two types of policies as policies of action and inaction. *Long*, 442 F.3d at 1185.

**[10]** A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, "that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right[,]" *Id.* at 1474 (quoting *Canton*, 489 U.S. at 389),

and that the policy caused the violation, "in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Gibson*, 290 F.3d at 1194.

The Supreme Court has explained that these heightened requirements for establishing responsibility for a policy of omission are necessary to avoid imposing respondeat superior liability, which would run afoul of *Monell*. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997). After all, when a municipal employee commits a constitutional tort, it could always be alleged that the municipality failed to enact a policy that would have prevented the tort. Without the rigorous state of mind requirements set out in *Canton* and subsequent cases, there would be nothing left of *Monell*'s rule against respondeat superior liability. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011); *Bd. of Cnty. Comm'rs*, 520 U.S. at 406-07. *Canton*'s standards thus ensure that, even if the alleged defect in the municipality's policy is one of omission, the acts of constitutional tortfeasors can still "fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs*, 520 U.S. at 404.

As the Supreme Court has also observed, however, such concerns are not present "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so." *Id*. Under this "direct path" to municipal liability, a plaintiff must "prove that the municipality acted with 'the state of mind required to prove the underlying violation,' just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Gibson*, 290 F.3d at 1185 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 405).

**[11]** As Tsao has stated her claim, the alleged deficiency is properly seen as one of omission. Desert Palace in effect adopted *two* policies, with a gap between them that created the circumstances in which Tsao was arrested. First, Desert Palace keeps records of those it ejects from its casinos, and when those people return, it arrests them for trespassing or

issues them citations under the SILA program. Second, Desert Palace sends promotional offers to repeat customers inviting them to visit the casino. Desert Palace's security staff has no way of determining whether someone they are about to arrest for trespassing has in fact been invited onto the property, and the marketing staff apparently is not informed that someone has been warned never to return. Desert Palace conducts these two functions entirely separately, without any safeguard in place to prevent the situation that arose here. If any patron evicted by the security department were automatically removed from the marketing department's mailing list, for instance, Tsao would not have received invitations, and there would be no question that she was trespassing. It is this gap in communication between the two departments, this omission, that led to the alleged constitutional violation in this case.

A review of our case law on policies of commission further supports the idea that, as Tsao has stated her claim, the policy at issue here is one of omission. An official municipal policy, the Court has explained, "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S.Ct. at 1359. Thus under the "direct path" to municipal liability, a policy may be facially unconstitutional, like "a city's policy of discriminating against pregnant women in violation of the Fourteenth Amendment." *Gibson*, 290 F.3d at 1185 (citing *Monell*, 436 U.S. at 658). Or the constitutional violation may be the result of a direct order from a policymaking official, like "a policy-maker's order to its employees to serve capiases[15] in violation of the Fourth Amendment." *Id.* at 1185-86 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). There is no suggestion here

---

[15]"A capias is a writ of attachment commanding a county official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt." *Gibson*, 290 F.3d at 1185 n.6 (quoting *Pembaur*, 475 U.S. at 472 n.1).

that Desert Palace's overall policy is to oust unwanted gamblers even though they have been invited onto the property, that there is any such persistent or widespread practice, or that a policymaking official directed Makeley to arrest her although the policymaker knew that she was at the casino by invitation.[16]

[12] As Tsao has stated her claim, the cause of her arrest is thus best seen as an omission in Desert Palace's policies—the failure to create a coordination system between security and marketing. Tsao therefore must show "that [Desert Palace's] deliberate indifference led to [this] omission." *Gibson*, 290 F.3d at 1186.

[13] To show deliberate indifference, Tsao must demonstrate "that [Desert Palace] was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* (citing *Farmer*, 511 U.S. at 841). Only then does the omission become "the functional equivalent of a decision by [Desert Palace] itself to violate the Constitution." *Connick*, 131 S. Ct. at 1360. As we observed in *Gibson*, "[p]olicies of omission regarding the supervision of employees . . . can be 'policies' or 'customs' that create municipal liability . . . only if the omission 'reflects a deliberate or conscious choice' to countenance the possibility of a constitutional violation." 290 F.3d at 1194 (quoting *Canton*, 489 U.S. at 389-90) (internal quotation marks omitted).

Tsao has not alleged that Desert Palace had actual notice of the flaw in its policies. The question thus becomes whether the risk that security personnel might arrest someone who had

---

[16]Makeley did consult with John Banner, the casino manager, before approaching Tsao. But when asked whether Banner had instructed him to arrest her if she didn't have identification, Makeley insisted that "that call was mine." Moreover, there is no indication that Banner knew, or was in a position to know, that Tsao had received promotional invitations covering the period in question.

been invited to the casino was so "obvious" that ignoring it amounted to deliberate indifference.

**[14]** Tsao has not introduced facts sufficient to make this showing. First, there is no indication that this problem has ever arisen other than in the case of Tsao herself. In considering claims based on a failure to train municipal employees, the Court has noted that "a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick*, 131 S. Ct. at 1360 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 409). Similarly, the absence here of any evidence of a pattern makes it far less likely that Tsao can prove Desert Palace was "on actual or constructive notice," *Farmer*, 511 U.S. at 841 (quoting *Canton*, 489 U.S. at 396) (internal quotation marks omitted), that its policy would lead to constitutional violations.

**[15]** Second, it is far from obvious that the omissions in Desert Palace's policies would necessarily give rise to this situation. Tsao is a professional gambler, and, having been kicked out of the casino at least five times under a variety of aliases, was well aware that she was most likely not welcome at the Caesars Palace blackjack tables. For the situation at the heart of this case to arise, two circumstances must coalesce: First, someone like Tsao—who knows that she is persona non grata as far as the casino is concerned—would have to give the casino her real name and address at some point, so they would appear on the marketing department's mailing list for promotional offers. Second, the unwanted gambler would have to interpret those promotional offers as invitations overriding previous trespass warnings and decide to return to the casino. It is not "obvious" that both of these things will happen, and Tsao has not introduced any evidence suggesting that Desert Palace was on constructive notice that its policy's omissions made this situation likely.

Under *Monell*, a plaintiff must also show that the policy at issue was the "actionable cause" of the constitutional viola-

tion, which requires showing both but-for and proximate causation. *Harper*, 533 F.3d at 1026. We are not convinced that the casino's omission was the but-for cause of Tsao's allegedly unlawful arrest. Even if marketing had told the security department that it sent Laurie Tsao an invitation, Makeley had no way at the outset of connecting the woman whose name was on the invitation with the woman he saw at the blackjack table. After all, Makeley had a record that she was ejected under the name Shuyu Deng; she was using a player's card with the name Monica Lieu; she gave her name Laurie Chang; and she was not carrying identification. Makeley did not learn the name was Laurie Tsao until after he had detained her, handcuffed her, taken her to the interrogation room, and kept her there for some time.

**[16]** For the foregoing reasons, we affirm the District Court's grant of summary judgment as to Tsao's § 1983 claim against Desert Palace.

### B.   *Officer Crumrine*

Tsao's § 1983 claim against Crumrine is relatively straightforward. The dispositive question is whether Crumrine had probable cause to arrest Tsao for obstructing his investigation, in violation of NRS § 197.190. The facts are undisputed, so the existence of probable cause is a question of law. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003); *Act Up!/ Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). The District Court held as a matter of law that Crumrine had probable cause to think that Tsao was obstructing his investigation. We agree.

In his Declaration of Arrest, Crumrine stated:

> Due to the fact that Tsao gave a different last name than the one she is registered to DMV with, the only legal name that I could access to verify Tsao's identity, I placed Tsao under arrest for Providing False

Information to a Police Officer NRS 197.190 and transported Tsao to Clark County Detention Center where she was booked accordingly.

Section 197.190 of the Nevada Revised Statutes, "Obstructing public officer," states in its entirety:

> Every person who, after due notice, shall refuse or neglect to make or furnish any statement, report or information lawfully required of him by any public officer, or who, in such statement, report or information shall make any willfully untrue, misleading or exaggerated statement, or who shall willfully hinder, delay or obstruct any public officer in the discharge of his official powers or duties, shall, where no other provision of law applies, be guilty of a misdemeanor.

According to Crumrine, he arrested Tsao for violating that part of NRS § 197.190 that punishes the making of "any willfully untrue . . . statement" to a "public officer" after "due notice," assuming that the information requested was "lawfully required" of the individual.

Under NRS § 171.123, police officers may detain individuals reasonably suspected of criminal behavior in order "to ascertain the person's identity and the suspicious circumstances." NRS § 171.123(3). The same statute provides that a person so detained "shall identify himself or herself, but may not be compelled to answer any other inquiry of any peace officer." *Id. Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 190-91 (2004) upheld NRS § 171.123's requirement that a suspect identify herself to a police officer against several constitutional challenges.

**[17]** The only question, then, is whether Crumrine had probable cause to believe that Tsao was obstructing his investigation in violation of NRS § 197.190. Notably, we need not confine our inquiry to Crumrine's declaration of arrest, which

said that Tsao was being arrested for "providing false information to a police officer"; the question is whether Crumrine had probable cause to arrest Tsao for *any* offense. *Devenpeck v. Alford*, 543 U.S. 146, 152-54 (2004) (noting that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"). We hold that he did.

Probable cause exists if Crumrine knew "reasonably trustworthy information sufficient to warrant a prudent person in believing that [Tsao] had committed or was committing an offense." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924-25 (9th Cir. 2001) (quoting *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995)) (internal quotation marks omitted). While an officer may not ignore exculpatory evidence that would negate a finding of probable cause, " '[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.' " *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (alteration in original) (quoting *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999)).

**[18]** Crumrine had probable cause to believe that Tsao was willfully delaying his investigation in violation of the statute by refusing to provide a name through which her identity as the person previously "trespassed" could be confirmed or disproved. Tsao was not *lying* when she gave her married name, Chang, which does appear on her passport. But by doing so, she did impede her arrest for trespass for some time, while Desert Palace security and police looked for her car and checked her other identifying information. And her motives for doing so were clearly suspect. In her deposition, Tsao admitted that she did not want the casino to know that her name was Tsao, because "that was the most pertinent name" and because she had had trouble with it at another casino. She also knew that Tsao was the name on her driver's license, bank accounts, credit cards, and Social Security card, so that withholding that name might make it harder to connect her to

the previously trespassed person. As it happened, Crumrine soon learned that Tsao's car was in the casino parking lot through the use of the panic button on her keys, and was able to pull up DMV records using the license plate. The disconnect between Tsao's insistence that her name was Chang and the records associated with her license plate and Social Security numbers gave Crumrine probable cause to believe she had been obstructing his investigation. She made a statement regarding her name that was misleading and calculated to delay the discovery of her identity, even though the name given was not literally false.

Tsao relies on *Arpin* for the proposition that Crumrine's duty to investigate included a duty to allow her to explain herself before being arrested. In *Arpin*, however, an officer arrested a bus passenger without performing any independent investigation whatsoever, relying entirely on the bus driver's report that the passenger had assaulted him. 261 F.3d at 924-25. The officer, we noted, "refused to identify himself, would not inform [Arpin] of the reason she was being arrested, and did not allow Arpin to explain her side of the story prior to arresting her." *Id.* at 925. Probable cause for Crumrine's belief that Tsao had committed a crime, by contrast, was not based on the report of a third party; it arose from the very investigation Crumrine performed. Unlike Arpin, Tsao was given an opportunity to answer questions and explain the situation. It was Tsao's obfuscatory answers to Crumrine's simple questions that created probable cause to arrest her. Tsao had many opportunities to tell Crumrine the name she had every reason to know—and indeed indicated that she did know—was the one he wanted for his investigation. Crumrine had probable cause to believe that Tsao had delayed his investigation with her misleading response. That Crumrine later learned that Tsao and Chang were the same person did not destroy probable cause for an arrest based on her earlier violation of the statute.

**[19]** We therefore affirm the District Court's grant of summary judgment to Crumrine on Tsao's § 1983 claim.

## II.   State law claims

**[20]** In addition to her § 1983 claims, Tsao alleged a number of claims arising under the common law of Nevada against both defendants. We affirm the District Court's grant of summary judgment to Desert Palace on the abuse of process claim for the reason the District Court gave: Tsao failed to adduce any evidence that Desert Palace acted with "an ulterior purpose." *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).

**[21]** For most of the other common law claims, the District Court's determination that Makeley and Crumrine each had probable cause to arrest Tsao formed the basis for the summary judgment to the respective defendants. Because we conclude that Crumrine did have probable cause to arrest Tsao, we affirm the grant of summary judgment to Crumrine on the battery, false imprisonment, and defamation claims. We vacate, however, the grant of summary judgment as to the battery, false imprisonment, assault, and premises liability claims directed at Desert Palace. We now remand those claims to the District Court for further proceedings, for reasons we shall explain shortly.

Before doing so, we note that the District Court misconstrued Tsao's final state law claim, alleging that Desert Palace committed common-law defamation. Under Nevada common law, defamation requires "(1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005). Tsao's defamation claim is based on *K-Mart Corp. v. Washington*, 866 P.2d 274 (Nev. 1993) (per curiam), in which the plaintiff was handcuffed and marched through a store on suspicion of shoplifting. *Id.* at 281. The Nevada Supreme Court held that "[t]he imputation of shoplifting, by words or by pan-

tomime, if communicated to a third party, is unquestionably slander *per se*." *Id.* at 283.

[22] The District Court apparently believed that Tsao's defamation claim against Desert Palace was based on Makeley's communication to Crumrine that Tsao had trespassed. On that understanding, the District Court held the communication privileged, as communications to police before the instigation of criminal proceedings are protected by a qualified privilege. *See Pope*, 114 P.3d at 284. But Tsao's defamation claim is *not* premised on any communications to Crumrine. Instead, it is grounded on Makeley's act of escorting her off the casino floor in handcuffs in view of other patrons. The qualified privilege does not apply in such circumstances. *See id.*; *K-Mart*, 866 P.2d at 282. We therefore vacate the District Court's grant of summary judgment to Desert Palace on Tsao's defamation claim, with the observation that this claim too will turn on whether there was in fact probable cause to detain Tsao—which, in turn, depends on the legal effect of the promotional offers under state law.[17]

As all the federal law claims have now been resolved without reaching the probable cause question, the circumstances under which the District Court decided to exercise its discretionary supplemental jurisdiction over the state law claims has changed. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 345, 357 (1988) (district court has discretion "to remand a properly removed case to state court when all federal-law claims in the action have been eliminated and only pendent

---

[17]We note that with respect to Tsao's battery claim, the Nevada Supreme Court has held that "a private person, when arresting another person pursuant to [the Nevada Citizen's Arrest Statute], may use no more force than is necessary and reasonable to secure the arrest." *State v. Wendell*, 118 Nev. 206, 209 (Nev. 2002) (en banc). Here, although Tsao did not behave belligerently, Makeley and two other security guards placed her in handcuffs and led her to the interview room. It is possible, therefore, that Makeley's conduct may not qualify as battery regardless of the probable cause determination.

state-law claims remain" when doing so "serves the principles of economy, convenience, fairness, and comity"). We therefore remand those claims to the District Court for reconsideration of the supplemental jurisdiction determination.

In doing so, we note in particular that we have now disposed of "all claims over which [the District Court] has original jurisdiction," 28 U.S.C. § 1367(c)(3), without reaching the probable cause question that overlaps with the state law claims. Moreover, the remaining state law claims "raise[ several] novel or complex issue[s] of State law" not recognized by the District Court *Id.* § 1367(c)(1).

Of particular difficulty is the question whether the promotional offers Tsao received were legally sufficient to rescind the prior trespass notice. Nevada's trespass statute does not address the manner in which a trespass warning may be rescinded, *see* NRS § 207.200, and there is no Nevada case law dealing with the issues of consent involved here. Desert Palace does not seriously dispute the conclusion that Tsao could have permissibly stayed at the Caesars Palace hotel, bet on basketball at its casino, or taken advantage of any of the other offers it mailed her. It argues, instead, that its invitations to Tsao were limited to those activities, pointing out that "[t]o be effective, consent must be . . . to the particular conduct, or substantially the same conduct." Restatement (Second) of Torts § 892A(2)(b). The Restatement also specifies that the precise scope of the consent is "normally for the trier of fact to determine," *id.* § 892A cmt. d. In making that determination, it is proper to take into account the consequences that Desert Palace subjectively anticipates when it sends these sorts of offers, as well as the consequences that were reasonably foreseeable to it. *See id.* § 892A cmts. d & e; *see also Shaheen v. Riviera Hotel Corp.*, 347 P.2d 285, 287 (Nev. 1959); *Babcock & Wilcox Co. v. Nolton*, 71 P.2d 1051, 1053 (Nev. 1937).

The fact that Tsao may not have subjectively believed that she had been invited to play blackjack at Caesars Palace might well have no legal significance. Consent can be effective when the actor, unaware that consent has been given, intends to trespass. *See* Restatement (Second) of Torts § 892, Illustration 1.[18] Thus, it could be pertinent—depending on what Nevada law concerning consent to trespass turns out to be—whether Desert Palace anticipated that those potential customers invited to stay at its hotel or bet on basketball would gamble in its casino.

A second novel state law question arises from Tsao's suggestion that even if Desert Palace had probable cause to believe she was trespassing, probable cause is not a defense to a claim of false imprisonment where there is a citizen's arrest, as Nevada's citizen's arrest statute authorizes citizen's arrests for misdemeanors only when a crime has in fact been committed. *See* NRS § 171.126 ("A private person may arrest another: . . . For a public offense committed or attempted in the person's presence."); *cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 352 (2001) ("It is of course easier to devise a minor-offense limitation by statute . . . . It is, in fact, only natural that States should resort to this sort of legislative regulation, for . . . it is in the interest of the police to limit petty-offense arrests . . . ."). Tsao's position is consistent with the general common law rule, *see Roth v. Golden Nugget Casino/Hotel, Inc.*, 576 F. Supp. 262, 266 (D. N.J. 1983) (citing *Prosser on Torts* § 17 at 100 (1971)), but there is no Nevada precedent on the question, it appears. There thus may be no

---

[18]That is not to say that an actor's subjective beliefs are always irrelevant. For example, in a civil case, "an overt manifestation of assent or willingness would not be effective [as consent] . . . if the [invitee] knew, or probably if he ought to have known in the exercise of reasonable care, that the [landowner] was mistaken as to the nature and quality of the invasion intended." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004) (quoting *Prosser & Keeton on the Law of Torts* § 18, at 119 (W. Page Keeton ed., 5th ed. 1984)).

way to resolve Tsao's state law false arrest claim without first determining another undecided question of state law.

Were we required to address these trespass-related issues to dispose of this case in its current posture, we would certify them to the Nevada Supreme Court, as they are potentially weighty and unsettled questions of state law. But our disposition of the federal claims has not required us to decide whether Desert Palace had probable cause to arrest Tsao for trespassing. The District Court's decision to exercise its discretion to assert jurisdiction over the state law issues assumed its resolution of the probable cause issue in the federal law analysis. As the District Court's probable cause analysis did not take account of the complexities just noted, as well as the actual nature of the defamation claim, we remand for the District Court to reconsider its assertion of jurisdiction over the state law claims. If it decides to consider those claims, then the District Court should reevaluate its rulings in light of this opinion.

## III.   Conclusion

**[23]** In sum, we affirm the grant of summary judgment to Desert Palace on Tsao's § 1983 and abuse of process claims; affirm the grant of summary judgment to Crumrine on Tsao's § 1983, common law false arrest, battery, and defamation claims; vacate the grant of summary judgment on all other claims; and remand for further proceedings. We also vacate the award of attorneys' fees to Crumrine and the award of costs to both defendants, as "[a] prevailing defendant is entitled to attorney fees under 42 U.S.C. § 1988 only when the plaintiff's claims are 'groundless, without foundation, frivolous, or unreasonable.' " *Karam v. City of Burbank*, 352 F.3d 1188, 1195 (9th Cir. 2003) (citation omitted). Tsao's § 1983 claims do not meet this standard, for the reasons we have indicated.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**