Kevin **BREAZEALE, et al., Plaintiffs,**

v.

**VICTIM SERVICES, INC. d/b/a Correctivesolutions, et al., Defendants.**

**Case No. 14-cv-05266-VC**

United States District Court, N.D. California.

Signed 07/27/2016

Paul Arons, Law Office of Paul Arons, Friday Harbor, WA, Blythe H. Chandler, Beth E. Terrell, Terrell Marshall Daudt and Willie PLLC, Seattle, WA, Deepak Gupta, Gupta Wessler PLLC, Washington, DC, Karl Olson, Michael Francis Ram, Susan S. Brown, Ram, Olson, Cereghino & Kopczynski LLP, San Francisco, CA, for Plaintiffs Kevin Breazeale, Karen Solberg, Kevin Hiep Vu and Nancy Morin.

Michael Andrew Taitelman, Sean Michael Hardy, Freedman & Taitelman LLP, Los Angeles, CA, for Defendants Victim Services, Inc., National Corrective Group, Inc. and Mats Jonsson.

## ORDER DENYING MOTION TO COMPEL ARBITRATION

VINCE CHHABRIA, United States District Judge

The first question presented by this motion to compel arbitration is whether the Federal Arbitration Act applies to a contract between a local prosecutor and a criminal suspect about how to address a potential state-law criminal violation. It does not.

The second question is whether California law allows arbitration of a dispute, between a citizen and the government or its agents, arising out of the exercise of the government's criminal law enforcement powers. It does not.

## I.

The California Legislature has authorized county district attorneys to create and administer diversion programs for people who write bad checks. Cal. Penal Code § 1001.60 *et seq.* The statutory scheme contemplates that the district attorney will create the county's diversion program 'within his or her office.' *Id.* § 1001.60. The scheme further provides that if a district attorney decides there is probable cause to believe a suspect has violated California Penal Code section 476a (which makes it a crime to write a bad check with the intent to defraud), the district attorney may refer the suspect to the program. *Id.* §§ 1001.60, 1001.61. Under the program, the district attorney promises not to prosecute the suspect, and the suspect agrees to pay back the victim, pay specified fees, and take a class about financial responsibility. *Id.* § 1001.64; *see also id.* § 1001.65. The district attorney may hire a private entity to administer the county's diversion program. *Id.* § 1001.60.

The defendants in this case are a handful of corporate entities, all of which are allegedly owned and controlled by Victim Services, Inc. For convenience, this ruling refers to the defendants simply as "Victim Services." Various county district attorneys in California have contracted with Victim Services to administer bad check diversion programs. The plaintiffs are five people who received letters from district attorneys, each on district attorney letterhead and under the signature of the relevant county district attorney, but sent by Victim Services. The letters threatened prosecution under California Penal Code section 476a unless the recipients agreed to participate in that county's bad check diversion program. The case is a proposed class action, with the plaintiffs proposing to represent all people to whom Victim Services sent similar letters on behalf of

California county district attorneys within the applicable statutes of limitations.

The lawsuit asserts a variety of claims. For example, the plaintiffs allege that Victim Services is violating the bad check diversion statutes by sending these letters to people and putting them in diversion programs even though no district attorney has first assessed whether there is probable cause to believe those people have written bad checks with intent to defraud (as the authorizing statutes require). The lawsuit also alleges that Victim Services imposes fees on participants in the diversion programs that are not contemplated by the authorizing statutes. And the lawsuit alleges that Victim Services violates the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, by imposing unlawful fees, making false threats, and sending deceptive letters to people.

Victim Services sent a letter to one of the plaintiffs, Narisha Bonakdar, on behalf of the El Dorado County District Attorney, Vern Pierson. The letter was on Pierson's letterhead, with his signature at the bottom. The Pierson letter began by telling Bonakdar she had "been accused of violating California Penal Code 476a." It stated that Bonakdar could "dispute the validity" of the allegation that she had violated section 476a "in writing" within 30 days of receiving the notice, and explained that "the authorized administrator of the Bad Check Restitution Program" would "review the written dispute based on criteria established by the El Dorado County District Attorney." The Pierson letter further explained that if Bonakdar participated in the program, she "acknowledge[d] and agree[d] that in addition to the fees that are charged," she would be "required to attend a rehabilitative counseling class." The letter also provided that "[c]ompletion of the Bad Check Restitution Program is valid ONLY if you comply with ALL District Attorney's requirements." And it pro-

vided that, "[b]y making full or partial payment, you are agreeing to be enrolled in the Bad Check Restitution Program, and you are agreeing to pay restitution on all reported checks as well as pay all required fees, including program, administrative, and returned item fees pursuant to the terms of this Notice."

The Pierson letter also included an arbitration provision among its "terms and conditions." After noting that the program was administered by an unidentified private entity, the letter stated, on the third page:

> Agreement to Arbitrate: You and Administrator agree to resolve any and all claims and disputes relating in any way to the Program ("Claims"), except for Claims concerning the validity, scope or enforceability of this Arbitration Agreement, through BINDING INDIVIDUAL ARBITRATION before the American Arbitration Association ("AAA"). This means you will be unable to have Claim(s) resolved by a court or jury, or to participate in a class action or class arbitration. Other rights you would have if you went to court may be unavailable or limited in arbitration, including your right to appeal. The only exception to this agreement to arbitrate is that you and/or Administrator may seek relief in a small claims court for Claims within the jurisdiction of that court in any particular state.

The letter further explained that participants could opt out of arbitration in writing within sixty days of enrolling in the program.

Bonakdar completed the diversion program. "As such," according to a declaration from the El Dorado County District Attorney's office filed by Victim Services, "Bonakdar's case has been resolved and she will not be prosecuted." Victim Services contends Bonakdar is therefore also

subject to the letter's terms and conditions, including the arbitration provision, because Bonakdar did not opt out of that provision. Victim Services has filed a motion to compel Bonakdar to arbitrate her claims on an individual basis. The other four named plaintiffs are not subject to any arbitration provision.

## II.

An arbitration provision contained in any contract governed by the Federal Arbitration Act is valid, irrevocable, and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA covers (with exceptions not pertinent here) maritime transactions and contracts "evidencing a transaction involving commerce." *Id.* Therefore, the first question is whether this contract—the agreement between the El Dorado County District Attorney and Bonakdar in which Bonakdar agreed to participate in the diversion program and the District Attorney agreed not to charge her if she successfully completed it—is a "contract evidencing a transaction involving commerce." As the Supreme Court has noted, although the statute refers to commerce generically, it actually covers contracts evidencing transactions affecting "interstate commerce." *See generally Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

## A.

While Victim Services insists that the FAA applies, Bonakdar makes conflicting statements on the question. Her inconsistency appears to stem from confusion about how to conceptualize the "contract" that is the subject of the inquiry. At one point Bonakdar assumes that the Court must look to the overall contract to decide whether it has the requisite connection to interstate commerce. Taking this perspective, she asserts: "An agreement to avoid

criminal prosecution does not, on its face, affect commerce in even the broadest sense." Dkt. No. 106 at 7 n.2 (citation omitted). But in subsequent filings Bonakdar assumes that the "contract" to be considered for purposes of assessing the connection to interstate commerce is not the overall non-prosecution agreement, but the arbitration provision contained within it, which she seems to treat as a separate, stand-alone contract with a purely private entity. Operating under this assumption, Bonakdar concludes that the FAA applies, because the arbitration provision benefits Victim Services, a for-profit company that uses the U.S. mail to collect debts from people who wrote bad checks to big companies. Dkt. No. 136 at 1.

■ Bonakdar's first approach is the correct one. The FAA speaks of a "contract" that contains an arbitration "provision," and it applies to any "contract" that evidences "a transaction" involving commerce. 9 U.S.C. § 2. It's not enough that the arbitration provision happens to benefit a private company: if the arbitration provision itself could supply the requisite effect on interstate commerce, the statutory language "evidencing a transaction involving commerce," modifying "a contract," would be rendered superfluous. *See, e.g., Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.,* 710 F.3d 946, 966 (9th Cir.2013) ("[C]ourts should not interpret statutes in a way that renders a provision superfluous."). Therefore, the connection to interstate commerce must be assessed with reference to the overall contract. To determine whether the FAA applies, a court must ask whether the "contract" itself (in this case, the non-prosecution agreement) evidences "a transaction involving commerce."

■ It does not matter, for the purpose of this inquiry, that the arbitration provision merely calls for Bondakar to arbitrate

disputes with the "Administrator," rather than calling for the District Attorney himself to arbitrate any disputes. This does not somehow cause the arbitration provision to become a separate contract from the non-prosecution agreement. After all, the "Administrator" mentioned in the District Attorney's letter (that is, Victim Services) acts as an agent of the El Dorado County District Attorney in the administration of the county's program. *See, e.g.,* Amended Complaint, Ex. 2, Dkt. No. 8-2, at 2 ("Administrative Support Services Agreement" between Victim Services and the El Dorado County District Attorney retaining Victim Services as the "duly authorized agent" of District Attorney for purposes of administering the diversion program). In this context, therefore, the provision is best understood not as some separate agreement but as a clause within the non-prosecution agreement that provides that any dispute between Bonakdar and the District Attorney's agent must be arbitrated. Accordingly, the relevant question is whether the El Dorado County District Attorney's letter to Bonakdar, offering not to prosecute her for a state-law crime if she successfully completed the diversion program (which she did), constitutes a "contract evidencing a transaction involving commerce," such that the FAA could apply to it.

**B.**

▆ The FAA stretches "broadly." *Allied–Bruce,* 513 U.S. at 272, 115 S.Ct. 834. But it would be too big a stretch to apply the FAA to this particular contract. The agreement in this case is not a contract between a customer and a telephone

provider. *Cf. AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 336, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). It's not a contract between an employee and an employer. *Cf. Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). It's an agreement between a criminal suspect and the local authorities about how to resolve a potential state-law criminal violation. Victim Services points to no case (nor is the Court aware of one) suggesting the FAA applies in a situation where a state is performing a criminal law enforcement function.

Indeed, Victim Services points to no case (nor is the Court aware of one) suggesting the FAA applies to *any* situation in which a state is exercising *any* of its "police powers"—that is, any of its power to regulate behavior for the purpose of promoting the health, welfare, and safety of its residents. It might be one thing to apply the FAA to a contract between a local government and a private party in a situation where the government is acting in its proprietary capacity—that is, as a market participant. *See, e.g., City of Vista v. Sutro & Co.,* 52 Cal.App.4th 401, 60 Cal.Rptr.2d 488, 491–93 (1997) (assuming without analysis that the FAA applies in such a context). It's quite another thing to assume the FAA applies to a contract evidencing the government's exercise of its police power.[1]

Nor is it relevant that the agreement requires the suspect to enter a program that happens to be administered by a private company. As already discussed, the company is administering the program on behalf of the government—acting as an

---

1. For explanations of the difference between situations in which the government exercises its police power and situations in which the government acts in a proprietary capacity, *see, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 592, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997); *Bldg. &* *Const. Trades Council v. Associated Builders & Contractors,* 507 U.S. 218, 226–29, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993); *Reeves, Inc. v. Stake,* 447 U.S. 429, 437–39, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Olympic Pipe Line Co. v. City of Seattle,* 437 F.3d 872, 881 (9th Cir.2006).

agent of the government in the exercise of the government's criminal law enforcement power. *See* Cal. Penal Code § 1001.60. If the government hired a private security firm to help police the streets, the firm would be performing a law enforcement function on behalf of the government, for the benefit of the state and cloaked in the state's authority. *Cf., e.g., West v. Atkins*, 487 U.S. 42, 54–57, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–41 (9th Cir.2012). Similarly, the bad check diversion program is the El Dorado County District Attorney's program and remains the responsibility of the District Attorney. As Pierson himself explains in a declaration submitted by Victim Services, "the El Dorado County District Attorney Bad Check Restitution Program is my program, not ... VS's program." Dkt. No. 92-2, at 3. Indeed, the California Penal Code requires that to be so. § 1001.60. The fact that a private company is helping the government in the exercise of its law enforcement power does not make it any less of an exercise of the government's law enforcement power. *Cf. West*, 487 U.S. at 54–57, 108 S.Ct. 2250; *Tsao*, 698 F.3d at 1139–41; *see also Del Campo v. Kennedy*, 517 F.3d 1070, 1081 n.16 (9th Cir.2008).[2]

Even construed broadly, there are natural limits to the statutory phrase "a contract evidencing a transaction involving commerce." *See, e.g., Office & Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*, 724 F.2d 133, 139 (D.C.Cir. 1983) (the FAA does not apply to an interstate agreement between Virginia, Maryland, and Washington, D.C). The agreement in this case simply does not fall within the plain meaning of those words.

Indeed, it seems inconceivable that Congress would have used the words "evidencing a transaction involving commerce" if it had intended the FAA to cover agreements between local prosecutors and criminal suspects resolving a potential violation of state criminal law. *See Iskanian v. CLS Transp. L.A., LLC*, 59 Cal.4th 348, 173 Cal.Rptr.3d 289, 327 P.3d 129, 150 (2014) ("There is no indication that the FAA was intended to govern disputes between the government in its law enforcement capacity and private individuals."), *cert, denied*, — U.S. —, 135 S.Ct. 1155, 190 L.Ed.2d 911 (2015).

Furthermore, even if the phrase "a contract evidencing a transaction involving commerce" could be considered ambiguous enough to apply theoretically to an agreement like this one, that ambiguity should not be resolved in favor of such a broad reading. "[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" "the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 243, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Courts must "refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute," and insist on a clear indication of Congressional intent "before interpreting the statute's expansive language in a way that intrudes on the police power of the States." *Bond v. United States*, — U.S. —, 134 S.Ct. 2077, 2090, 189 L.Ed.2d 1 (2014). This means courts should be certain of Congress' intent before holding that the FAA

---

**2.** This would be true, by the way, even if the agreement to arbitrate were contained in a separate instrument executed only by Bonakdar and Victim Services. The existence of a separate instrument would not change the fact that Victim Services, in its relationship with Bonakdar, is acting as an agent of the government, assisting the government in the exercise of its police power.

applies to a contract evidencing an exercise of the state's police power (as opposed to a contract evidencing a transaction between two private actors, or maybe even a contract through which the state acts as a market participant).

And "[p]erhaps the clearest example" of the traditional state police power "is the punishment of local criminal activity." *Id.* at 2089 (citing *United States v. Morrison,* 529 U.S. 598, 618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000)). It would be difficult to imagine a deeper intrusion into the state police power than an attempt by Congress to legislate about an agreement between a local prosecutor and a person suspected of violating a state penal code provision. Indeed, this type of insertion into local criminal matters would intrude more deeply into traditional state authority than a mere attempt by Congress to separately criminalize a local crime. *See, e.g., Jones v. United States,* 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). In that latter type of case, at least Congress is not involving itself in the mechanics of local law enforcement. The broad reading of the FAA urged here would ascribe to Congress an intent to dictate how provisions within agreements between local prosecutors and criminal suspects must be interpreted and enforced.

Moreover, applying federal law to require arbitration of a dispute arising from the administration of a local bad check diversion program may well intrude upon the prerogative of the state legislature. As discussed in Section I, it was the California Legislature that created and authorized bad check diversion programs in the first place. And in doing so, the Legislature placed limits on the manner in which local prosecutors and their agents could operate those programs. For example, the Legislature specified that no person may be placed in a bad check diversion program unless the district attorney has found probable cause to believe that the person wrote a bad check with intent to defraud. Presumably when the Legislature imposed limitations like this, it expected that the courts would be available to enforce them. Surely the Legislature did not anticipate that a private entity like the American Arbitration Association, rather than the courts, might be deciding whether a citizen had been unlawfully placed in a diversion program without any proper finding of probable cause by the district attorney. Nor could the Legislature have expected that *federal* law (as opposed to state law) could govern whether disputes arising out of this type of criminal law enforcement program could be arbitrated.

Victim Services insists the FAA nonetheless applies because the District Attorney's letter to Bonakdar contained language specifying that the agreement involves interstate commerce and that the contract was therefore governed by the FAA. But the parties' mistaken belief that the FAA applies to their agreement cannot make it so. *Cf. Office & Prof'l Emps. Int'l Union,* 724 F.2d at 139 (the FAA, "by its own terms," "is not applicable" to agreements to arbitrate that do not fall within the scope of 9 U.S.C. § 2). The parties can't agree that Congress intended to reach a contract that it didn't intend to reach, any more than Carole Bond and the U.S. Attorney's Office could have agreed that the chemical weapons statute applied to her conduct. *Cf. Bond,* 134 S.Ct. at 2093.

■ Nor, contrary to Victim Services' argument, does the fact that Congress excluded from FDCPA liability certain private entities administering bad check diversion programs mean that the Court should construe the FAA to apply to Bonakdar's non-prosecution agreement with the El Dorado County District Attorney. *See* 15 U.S.C. § 1692p. Congress undoubt-

edly has the power, under the Commerce Clause, to regulate abusive debt collection practices that substantially affect interstate commerce. The fact that Congress expressly *exempted* from FDCPA coverage private entities administering bad check diversion programs so long as those entities are complying with state laws, if anything, expresses Congressional intent *not* to regulate in this sensitive area traditionally left to the states.

Finally, if Congress *had* expressed a clear intent for the FAA to reach agreements between local law enforcement authorities and criminal suspects about how to resolve potential state-law criminal violations, this would likely exceed the scope of Congress's commerce power. Although Congress presumably has the power under the Commerce Clause to federalize the crime proscribed by California Penal Code section 476a (namely, writing a bad check with the intent to defraud), it does not follow that Congress has the power to enact federal legislation about agreements between local prosecutors and suspects regarding the disposition of a potential charge under section 476a itself. It's doubtful that those types of agreements (as opposed to the crimes that underlie them) substantially affect interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *United States v. Morrison*, 529 U.S. 598, 610, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); cf. *Allied–Bruce*, 513 U.S. at 281, 115 S.Ct. 834. And even if the meaning of the Commerce Clause could extend this far, that would not be dispositive of whether Congress had the power to act— for the reasons stated above, legislation about agreements between local prosecutors and criminal suspects may nonetheless constitute so great an infringement on state sovereignty that it would not be a "Necessary and Proper" exercise of the commerce power. *Cf. Printz v. United States*, 521 U.S. 898, 924, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (citing *New York v. United States*, 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)); *Lopez*, 514 U.S. at 564, 115 S.Ct. 1624 (rejecting a theory of Congressional power that would make it "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement . . . where States historically have been sovereign").

## III.

■ Although the FAA is inapplicable, this does not automatically mean Bonakdar can avoid arbitration. When a contract with an arbitration provision falls beyond the reach of the FAA, courts look to state law to decide whether arbitration should be compelled nonetheless. *See, e.g., Valdes v. Swift Transp. Co.*, 292 F.Supp.2d 524, 528 (S.D.N.Y.2003). The parties agree that California law would apply here if the FAA did not.

### A.

■ California law, like federal law, generally "favors enforcement of valid arbitration agreements." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 678 (2000). But under section 1281.2(b) of the California Code of Civil Procedure, a court must refuse to compel arbitration if "[g]rounds exist for the revocation" of the arbitration agreement. An agreement to arbitrate (like a contract generally) is subject to "revocation" within the meaning of section 1281(b) if it's contrary to California public policy, as are contracts generally. *See, e.g., Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 687; *Bickel v. Sunrise Assisted Living*, 206 Cal.App.4th 1, 141 Cal.Rptr.3d 586, 590 (2012).

■ The arbitration provision contained in the contract between Bonakdar and the El Dorado County District Attorney is contrary to California public policy.

As discussed in the previous section, the legislature conferred power on executive officials (and their agents) to operate these criminal law enforcement programs, but simultaneously imposed limits on the exercise of that power. For example, the statutory scheme specifies the fees that may be imposed on citizens through this program, and it specifies that people cannot be placed in the program without a probable cause determination by the district attorney. *See* Cal. Penal Code §§ 1001.60, 1001.65. When a legislature confers criminal law enforcement power on executive officials and their agents, and imposes specified limits on the exercise of that power, it expects the courts to be available to enforce those limits. *Cf., e.g., Super. Court v. Cty. of Mendocino*, 13 Cal.4th 45, 51 Cal.Rptr.2d 837, 913 P.2d 1046, 1051 (1996) ("The executive branch ... may not disregard legislatively prescribed directives and limits" on its exercise of executive powers). But if this arbitration provision were enforceable, it would mean private arbitration could be used to prevent the judiciary from overseeing the exercise of the state's police power by executive officials and their agents—even when the criminal law enforcement function is involved. And it would concentrate an alarming amount of power in the hands of executive officials and their agents, allowing them to steer disputes about whether they had abused their law enforcement power to private tribunals and away from the courts. *See, e.g., People v. Bunn*, 27 Cal.4th 1, 115 Cal.Rptr.2d 192, 37 P.3d 380, 390 (2002) (doctrine of separation of powers "seeks to avoid ... the 'concentration of power in a single branch of government'" (quoting *Kasler v. Lockyer*, 23 Cal.4th 472, 97 Cal. Rptr.2d 334, 2 P.3d 581, 595 (2000))).

■ Separation of powers "requires accountability in all governmental functions, including the prosecutorial function, so that the citizenry may hold public officials to answer for error, abuse, or misguided priorities." *Steen v. Super. Court*, 59 Cal.4th 1045, 175 Cal.Rptr.3d 760, 331 P.3d 136, 146 (2014) (Liu, J., concurring). Even in areas where law enforcement officials have the broadest possible discretion, the courts retain an important role in ensuring discretion is not abused. For example, while a prosecutor's charging decisions are generally not subject to judicial review absent a showing that they were infected by constitutionally prohibited bias, *see, e.g., United States v. Palmer*, 3 F.3d 300, 305 (9th Cir.1993), the courts must be open to hear those claims. Though a court should deny a motion to dismiss the indictment on separation of powers grounds if the defendant fails to make a preliminary showing of impermissible charging discrimination, under those same principles it surely would never be appropriate to compel a defendant to litigate that motion in private arbitration rather than before the judiciary.

And that would be true even if the district attorney happened to use a private company to assist him in making charging decisions. Nobody would contend that a discriminatory charging recommendation by that company could escape court review merely because the district attorney has chosen to delegate that aspect of the prosecutorial function, by contract, to a private agent. The same is true of decisions made about how to treat suspects in a bad check diversion program, even when the district attorney has decided to use a private contractor to assist in administration of that program. Imagine, for example, if an employee of Victim Services told a participant in a bad check diversion program that, unless the participant paid the employee a bribe, the employee would tell the district attorney that charges should be brought under California Penal Code section 476a because the participant failed to successfully complete the program. Or imagine if

a Victim Services employee were refusing to certify that certain participants had completed the program based on race, sexual orientation, or some other characteristic that had no lawful bearing on whether they should be prosecuted. If a participant filed a lawsuit in response to such conduct, would anyone seriously contend that a private arbitrator rather than a court should be charged with policing this abuse of criminal law enforcement power, simply because it was an agent of the district attorney, rather than the district attorney himself, who solicited the bribe or who discriminated in such a fashion?[3]

Last but not least, because private arbitration is not part of the public record, arbitration provisions in this context would, in addition to denying citizens judicial protection from abuses of the police power at the hands of the government or its agents, shield such abuses from public scrutiny. This would violate California's strong public policy in favor of bringing such conduct to light. Indeed, the California Constitution states: "The People have the right of access to information concerning the conduct of the people's business." Cal. Const, art. I, § 3(b)(1). This right exists because "'[o]penness in government is essential to the functioning of a democracy." *Sierra Club v. Super. Court*, 57 Cal.4th 157, 158 Cal.Rptr.3d 639, 302 P.3d 1026, 1030–31 (2013) (quoting *Int'l Fed'n of Prof'l & Tech. Eng'rs Local 21 v. Super. Court*, 42 Cal.4th 319, 64 Cal.Rptr.3d 693, 165 P.3d 488, 492 (2007)). "Implicit in the democratic process is the notion that government should be accountable for its ac-

tions.... [Public] access permits checks against the arbitrary exercise of official power and secrecy in the political process." *Id.*; *cf. Steen*, 175 Cal.Rptr.3d 760, 331 P.3d at 146 (Liu, J., concurring). This concern applies whenever the state is exercising its police power, but it is of particular concern in the context of criminal law enforcement. And it applies equally (if not more so) when a private entity is acting as an agent of the government to perform a law enforcement function. Thus, even if a citizen in Bonakdar's position could be deemed to have voluntarily agreed to relinquish the right to judicial protection, public policy militates against allowing arbitration in this context. *Cf. Town of Newton v. Rumery*, 480 U.S. 386, 400–01, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (O'Connor, J., concurring in the judgment) (public policy disfavors a prosecutor's agreement to drop criminal charges in exchange for a defendant's promise not to bring a 42 U.S.C. § 1983 claim, because such agreements "potentially threaten the integrity of the criminal process"; "The coercive power of criminal process may be twisted to serve the end of suppressing complaints against official abuse, to the detriment not only of the victim of such abuse, but also of society as a whole."); *Cain v. Darby Borough*, 7 F.3d 377, 380 (3d Cir.1993) (in banc) (there are "strong public interests" against enforcing release-dismissal agreements, because civil rights lawsuits "provide an important check on public officials" by bringing official misconduct to light and deterring future abuses).

---

3. The same separation of powers concerns would be present even if the agreement to arbitrate were contained in a separate instrument executed solely by Victim Services and Bonakdar. As already discussed, Victim Services is acting as an agent of the El Dorado County District Attorney, administering a criminal law enforcement program on behalf of the executive. *Cf. Tsao*, 698 F.3d at 1139–

41. Because Victim Services is acting as an agent of the executive in administering that program, an agreement to arbitrate a dispute between a person participating in that program and Victim Services would be contrary to public policy, regardless whether it was memorialized in a non-prosecution agreement or a separate instrument.

In sum, if the government uses private agents in the exercise of its law enforcement power, California public policy requires that the conduct of those agents be subject to judicial review.

**B.**

■ Even if the arbitration provision were not contrary to public policy, the Court would deny the motion to compel under section 1281.2(c) of the California Code of Civil Procedure. Under that provision, a court may deny a motion to compel if one of the parties to the arbitration agreement is also a party to a court action, involving a third party, "arising out of the same transaction or series of related transactions," thus raising a "possibility of conflicting rulings" between the arbitrator and the court "on a common issue of law or fact." Victim Services is embroiled in litigation with people other than Bonakdar, based on the same course of conduct. Specifically, there are four other named plaintiffs in this case, all of whom received virtually identical letters from Victim Services. They all allege Victim Services sent them the letters without having obtained a probable cause finding from the relevant county district attorney, as required by the state statutory scheme authorizing the diversion programs. They all allege Victim Services demanded fees not authorized by that statutory scheme. And they all complain that the letters they received violated the federal Fair Debt Collection Practices Act. But the other four plaintiffs are not subject to any arbitration provision, either because they never participated in the program or because they opted out of the relevant arbitration provision, so there is no question about their right to pursue their claims in court. Therefore, sending Bonakdar's case to arbitration would risk "a myriad of conflicting rulings" between this court and the arbitrator. *Birl v. Heritage Care LLC*, 172 Cal.App.4th 1313, 91 Cal.Rptr.3d 777, 783 (2009).

Victim Services argues that, even if California law applies, section 1281.2(c) does not apply because it is a procedural rule rather than a substantive one, and the parties did not specifically incorporate it into the contract. For this proposition Victim Services quotes several cases out of context, including *Stone & Webster*, 210 F.Supp.2d 1177, 1187–88 (S.D.Cal.2002), which states: "Section 1281(c) is a state procedural law, and therefore the parties must have made specific reference to it in their agreement in order to effectively incorporate it into their contract." But as *Stone & Webster* was careful to note repeatedly, that rule applies "where the issue would otherwise be governed by the FAA." *Id.* at 1182 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)); *see also id.* at 1184; *Skyware, Inc. v. Abramson*, No. 11–cv–00545–PSG, 2011 WL 2883446, at *2 (N.D.Cal. July 18, 2011). It does not apply in a case like this one, where the FAA does not govern the contract and California law applies by default. Under these circumstances, it is irrelevant that the parties did not specifically cite section 1281.2(c). The Court is not holding that the parties *intended* to incorporate section 1281.2(c) into the agreement. *Cf. Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1212 (9th Cir.1998); *BioMagic, Inc. v. Dutch Bros. Enterprises, LLC*, 729 F.Supp.2d 1140, 1142 (C.D.Cal. 2010). Rather, the Court is compelled under federal choice of law principles to apply California's arbitration law in the absence of any other controlling law. *See Valdes*, 292 F.Supp.2d at 528. In such a situation, there is no reason to apply only some of California's arbitration rules and not others.

Given the risk of conflicting rulings between a court and an arbitrator on the same issues, the Court would exercise its discretion to decline to enforce the arbitra-

tion provision under section 1281.2(c), even if it were not contrary to California public policy under section 1281.2(b).

### IV.

The motion to compel Bonakdar to arbitration is denied.

**IT IS SO ORDERED.**